Bobby Brown, William E. Scott, Tyrone Day, and others v. Brad Livingston. We'll hear first from Mr. Potipoff. May it please the court, Alex Potipoff for the appellant. This court has repeatedly upheld TDCJ's common sense requirement that inmate religious gatherings must be supervised by a staff member or volunteer. Nevertheless, in this case, the district court held that TDCJ could not lawfully apply this requirement to Muslim inmates. This decision should be reversed. I'd like to begin with the plaintiff's SARLUPA claim. Under this court's precedence, their claim fails under both prongs of SARLUPA. First, this court has held three times in three indistinguishable cases that the direct supervision requirement does not impose a substantial burden on religious practice because the limited number of services is caused by the lack of willing volunteers of that faith and not by any prohibition. Before we get too far down the road, what can, will the outcome of the Scott appeal, can it in some way affect what we decide today? The two cases are certainly related. We believe that one of the issues that was presented by the district court's ruling in Scott is that it suggested that if we allow Muslims to meet without direct supervision, we would also have to allow all other faiths to meet without direct supervision, which certainly creates a lot more danger, and it would mean that maintaining the exemption from direct supervision for Muslims would become even more difficult than it would be otherwise. It would essentially make it either much more costly or much more dangerous. So in that respect, and also the validity of the Scott plan is at issue both in that appeal and in this appeal. So actually this appeal could also affect the Scott appeal as well. Well, that's what I'm, how do we, if the court were to say in Scott that the Scott plan is valid, this appeal seems to say it's not, at least as to the Muslims. Absolutely. We think that. How do we keep our opinions from possibly conflicting? Well, I'm not certain what the procedure is on this court when there are sort of parallel cases presenting similar issues. We actually moved at one point to consolidate the two appeals, and that motion was denied. But because this is the first case that is in the queue that would evaluate the validity of the Scott plan, it seems more logical perhaps that this. It's scheduled for argument next month, isn't it? That is true, but certainly just chronologically this case is first. And also I would add that Scott also has some other jurisdictional issues such as mootness. So in some ways this case presents the better vehicle for resolving the validity of the Scott plan. In any event, in Adkins, in Baranowski, and in O'Dneill, each of those cases are indistinguishable from this one. In each of those, an inmate suggested that religious services were insufficiently frequently provided in accordance with the tenets of their faith. And in each of those cases, this court said that because services were provided somewhat regularly, and because there was no prohibition on further services, and the limit on the number of services simply came from the number of willing volunteers, the limitation on the services was caused by the lack of volunteers and not by the direct supervision requirement. And accordingly, there was no substantial burden on the inmate's religious practice. And all of those holdings apply directly to this case. And in Mayfield, this court articulated a couple of exceptions, but none of those exceptions apply here. One of those exceptions, for instance, the most important one, is if no services are being provided or virtually no services. For instance, in Mayfield it was less than once a year, whereas here services are being provided once a week. So it's certainly on the Atkins side of the line as opposed to the Mayfield side of the line. So accordingly, the plaintiff's claim fails at the first step of our LUPA, and that's enough to defeat the claim. But moving to the second step of our LUPA, which is the narrow tailoring to compelling state interest, again there's this positive precedent. I wanted to ask you a question about those cases. Have they been modified or impacted by the Supreme Court's case in Hobby Lobby and other cases where the Supreme Court seems to say that a state cannot claim that a third party's actions were responsible for what its policy brings about? Well, we would say that the Atkins line of cases has not been impacted by Hobby Lobby and Holt versus Hobbs because those cases involved direct prohibitions on the relevant activity. And so the question was, is there a substantial burden? And the question here is not, is there a substantial burden? The question is, what is causing the substantial burden? And what this court has repeatedly said is that given that TDCJ is providing regular services and it's attempting to find more volunteers, so it's doing everything it can to facilitate services, its policy is not the reason for the limited number of services. Instead, the limited number of available volunteers is the reason. But even assuming there is a substantial burden, Your Honor, this court held in 2013 in chance that Atkins as well as other decisions by this court confirm that TDCJ's policy is a permissible attempt to accommodate diverse religious exercise with limited resources. The court pointed out that the volunteer requirement, which is another name for the direct supervision requirement, is reasonable and necessary, and noted that it is the least restrictive means of furthering TDCJ's compelling interest in prison administration. And in saying that, it echoed earlier decisions from this court. For instance, McAllister, where the court noted that the policy is supported by compelling interest in prison security. Is your argument supported by the evidence in this case? Absolutely. Or are you simply relying on previous cases and somebody's testimony that is contrary to the evidence in the case as found by the trial judge? Well, are you really showing us that the trial judge made a clear error of factual finding here? Or are you simply relying on what's been said in previous cases and dicta? So we do think that the district court was bound by chance in the earlier decisions, but we also believe that even on a blank slate, this court's decision would be clearly erroneous. And so I'm happy to review some of the relevant evidence. So the first point is that, as I was mentioning earlier, as a result of the district court's decision in Scott, we don't have to just consider Muslim services. We have to consider the possibility that TDCJ would have to allow all services to proceed without direct supervision. And Appleby's, in this case, concede that non-Muslim services are dangerous. And there's an enormous amount of evidence to support that. For instance, their own witness, an inmate, said that he saw fights which required lockdowns in non-Muslim services. Their security expert said that he knew of serious incidents of bodily harm that occurred at non-Muslim services. And we also put forward several exhibits, for instance, reflecting a 2010 escape attempt that took place after a general religious service in which inmates attempt to scale the fence and were shot. That's Defense Exhibit 47. Defense Exhibit 49 involved a 2011 incident where an inmate was leaving the chapel and was assaulted and ultimately had to have two teeth removed. And Defense Exhibit 51 involved a fight between three inmates leaving Protestant services where TDCJ personnel were forced to use a chemical agent to subdue them, and one of them was found to have an eight-inch weapon. But even assuming, again, that we had to focus exclusively on Muslim services, there's still ample evidence to conclude that those services are dangerous and that direct supervision would help alleviate that danger. How can you say that after, what, 35 years of indirect supervision? And I understand that the trial judge found no serious incidents among Muslims. Is that right? The district judge did find that, but that finding was clearly erroneous. So first, the appellee's own witness, again, noted that there had been fights in Muslim services. And also we put forward evidence which the district court excluded of a fight that took place in the Ramadan service in 2013. And the reason that was excluded by the district court is the district court said, well, that doesn't count because that happened under direct supervision. But, of course, our theory was never that direct supervision prevents all incidents. Our theory is simply that it helps limit the damage that comes from those incidents and limit the number of those incidents. So what that fight demonstrates is that the appellees are wrong to say that there's simply no danger associated with Muslim services. And so then the next question is, does direct supervision benefit the security interests? And we had virtually unchallenged expert testimony on that. But also, again, their witness, inmate Fleming, said there were multiple disruptions in Muslim services where inmates had to be escorted out. The court also took judicial notice of Watson v. Wakefield as well as Lemons v. TDCJ. You're saying this to the place in the record we can find that? Yeah, that's right. Those are Defense Exhibit 16 and Defense Exhibit 18. You don't have to repeat them now, but I just want to tell you, if you haven't pointed to them, we're certainly going to look for them. And if we can't find them, then that will count against you, of course. Well, we pointed, we cited those in our briefs, and those are defense exhibits that should be available to you. And they're also simply district court opinions in this circuit that the district court took. I haven't read the record, but I have had law clerks who have looked at it, and it seemed to me the evidence was overwhelmingly in support of the trial court's findings. Well, I think part of the reason for that is that the trial court made a number of errors, again, in terms of excluding evidence. For instance, we proffered testimony that there were two incidents of contraband, of improper DVDs being shown at Muslim services. That's at ROA 3677 to 79. And the district court did not think that was relevant because that was simply paraphernalia. Those were not violent incidents. Was the district court making the distinction between whether there were, in fact, dust-ups at these Muslim services and whether they ever were actually the subject of official write-ups? There seemed to be a distinction between what happened and whether, in the prison system, whatever happened resulted in some kind of a write-up. I don't know what the expression is, write-up. Sure, incident report. An incident report. And that's true. The district court attached a lot of significance to the fact that there were no or few incident reports that we pointed to. And the fact is that, first of all, officers in TDCJ have a lot of discretion whether or not to write incident reports. But more importantly, and this is a really key point that we believe the district court overlooked and another reason why its finding was clearly erroneous, is that there are many incidents that TDCJ is certainly unaware of precisely because Muslim services were not directly supervised, precisely because TDCJ personnel and volunteers were not there to note what was happening. And this is not mere speculation. The plaintiff's witness, Chaplain Shabazz, testified that Muslims, quote, and a lot of times things happen among the Muslim community that the administration don't know about. And there could even be a disturbance that maybe the warden or the chaplaincy might not know about. Who are you quoting for that? That is Chaplain Shabazz, and that's at ROA 3818 to 3820. And that type of testimony, Your Honor, points out another fundamental danger of religious services that's specific to religious services. And that's the danger of creating an alternative hierarchy within the prison, which is something that Judge Posner was worried about in Johnson Bay, for instance. And we actually put forward evidence, and this is at ROA 1521, that Muslim inmates were holding secret hearings and issuing discipline to each other, such as temporary exclusion from Muslim services, and also that this infrastructure was being used to conceal illegal activities, such as running illegal substances and organizing gambling rings. And so we would submit that that is precisely the kind of danger that you would expect in unmonitored services. And so that is precisely the kind of thing that TDCJ is appropriately worried about. And I would also make another quick point about the clear error standard, which is that this Court has repeatedly held that district courts are not entitled to the clear error standard when they apply incorrect legal standards in reviewing the evidence. And this Court did that in a variety of ways. First of all— You're talking about a legal error? I'm sorry? You're talking about a legal error? Correct. It used incorrect legal standards in evaluating the evidence, and thereby lost the entitlement to clear error review. First of all, it believed that rather than being bound by this Court's decisions in Chance and Adkins, et cetera, it was bound by its own decision in Scott. It actually said that the Scott ruling, quote, necessarily eliminates safety or security concerns as a justification for the policy. So it held this bench trial, but it's entirely unclear why. Because even prior to the bench trial, it said that it was already clear that, quote, the proposal imposes a current ongoing violation of religious rights. Also, the district court improperly ignored the testimony of our experts, in particular the security expert, Mr. Eason. That is an error both under our loop and under the PLRA. The PLRA requires district courts to give substantial weight to adverse impact on public safety, which in turn, as the district court explained in Brown v. Plata, requires due deference to informed opinions, as well as reliance on relevant and informed expert testimony. And we would submit that requires, at the very least, engaging with detailed and relevant testimony by our security expert, instead of not mentioning him altogether. And also, under our loop, both this court and the Supreme Court have said that context matters, and therefore due deference is due to the expertise of prison officials. Of course, we're not asking for unquestioning deference, which is what the Supreme Court rejected in Holt. But the court also said that prison officials are experts, and courts should respect that expertise. And we would submit that, again, not even mentioning Mr. Eason does not count as respecting that expertise. And I would like to reserve the remainder of my time, if I may. Yes, sir. Thank you, sir. Mr. Bernberg? Yes, thank you, Your Honor, and may it please the Court. Cutting to the chase, the ultimate question, really, in this case, is whether indirect supervision of Muslim religious services so compromises prison security and safety that prohibiting Muslims from having services under indirect supervision is the only means of achieving the state's legitimate, indeed compelling, interest in security. Now, the district court made explicit findings that the conduct of Muslim inmate services under the Brown regime did not pose any security problems, and that there's no evidence that direct supervision would have been any more successful. And the record completely supports that finding. This is what is really hard for me to accept in the context of a prison. You say that because having guards supervise a religious service and they cannot quell every kind of incident, therefore, you can't have any guards. No, Your Honor, that's not our point at all. That's your argument. No, Your Honor, that's... Because since you can't stop incidents with supervised services, that's not the least restrictive means. You must have unsupervised. No. I find that hard to follow. Your Honor, what the point is is that the state's burden is to demonstrate that direct supervision is better than indirect supervision. That's the relationship between the two. Now, we're not saying that because there are problems with some services that are directly supervised. It's almost verbatim to say, well, they had problems during direct supervision, so they couldn't stop it during direct supervision, so they shouldn't have any supervision at all. No, that is not our argument in any way, Judge Owen. Our argument is solely that, is exclusively in this regard that, the state has the burden of proving that direct supervision is the least restrictive way of achieving its objectives. Well, it's not the least restrictive ways unless it's better than indirect supervision. And indirect supervision has proven to be completely satisfactory for 35 years. How many Muslims were in the prison system 35 years ago? Well, it's been a relatively consistent percentage of the prison population. Number-wise. How many are there now? 35 years ago, how many Muslims were in the Texas prison system? I do not know the total number in that 35 years. The record would demonstrate that, by the way, because we do have evidence of that. But it is not an insignificant number. The inmate population has always been several thousand inmates throughout that entire 35-year period of time. These 7,000 are not all in one prison, are they? Oh, no, Your Honor. They're in 96 prison units spread throughout the entire state. Do you know if the concentration of Islam prisoners was as big in certain prisons over the 35 years or not, or do we have any evidence? Well, we do have records of what the concentration of inmate prisoners has been at least during the present time or near the present time. In fact, one of the problems of the establishment problem, Your Honor, is that Jewish inmates and Native American inmates are specifically assigned to prison units which are near population centers where there will be a substantial number of Jewish or Native American volunteers. And the prison officials testified that that was the reason for those assignments. By contrast, the Muslim inmates are spread throughout the entire state in 96 different units, and they're not put anywhere close to the population centers where there are, in fact, Muslim potential volunteers, which would be predominantly Houston and Dallas. The record evidence demonstrates and shows. Did the state introduce evidence as to why the Muslim prisoners are interspersed that way or why they're not concentrated, et cetera? The answer to that question is one thing is there, in fact, are considerably more Muslim inmates than Jewish inmates. There's about 80 percent as many Native Americans as there are Muslim inmates. There is no evidence in the record as to why that is so, but here's the point. The prisons, and we don't fault this, are built at places where there aren't people. They're built out in various locations which are far from the kinds of urban centers where there are potential volunteers. Now, again, there's no problem here, but in Texas you can't build a prison anywhere that there are not plenty of Christians available to volunteer to work in the prisons. However, you can't build prisons anyplace much outside of the Dallas, maybe San Antonio or Houston area, which is within an hour or an hour and a half where there are potential Muslim volunteers within an hour to an hour and a half. But I wanted to address Judge King's question with regard to the significance of the incident reports. The incident reports are incredible. We ask has there ever been a single, a single incident report coming out of a Muslim indirectly supervised activity any time during this 35 years, and the answer is no, there has not been a single report. Well, why is that important? That's important because TDC rules specifically provide that there must be, it is mandatory that there be, a written incident report any time there is any risk to security or safety that is posed by an incident. So the absence of any incident reports during that entire period of time is incredibly significant because it indicates that the prison officials didn't consider anything to be significant. And by the way, the prison officials did not even move to vacate this consent decree at any time during that 35 years or for any reasons associated with security. They testified. Chaplain Pierce testified that the only reason they moved to change was because they were afraid of the slippery slope problem in response to the Scott decree. Well, the Supreme Court pretty definitively answered that recently in Holt v. Hobbs, Justice Alito says at the bottom, this argument is but another formulation of the classic rejoinder of bureaucrats throughout history. If I make an exception for you, I'll have to make it for everybody without exception. We have rejected that argument in analogous context and we reject it again today. Judge Owen, with regard to what's the interplay between the Muslims and the Jehovah's Witnesses, the answer to that question depends upon the records in those cases. The record in this case includes the testimony of the director of chaplaincy services who said, quote, throughout this 35 years. Here's my concern, and it's twofold. One, the district court said, well, you can't put on evidence of isolated incidents. You've got to show statistical evidence. And that would never pass muster in an Eighth Amendment case. If somebody were murdered once and somebody was raped or murdered a second time, well, the second person would come and say, you were on notice, the state was on notice, you violated my Eighth Amendment rights. You don't have to put on statistical significant analysis. One murder is enough. So the argument goes. And do they have to wait until they're five rapes or six rapes or seven? So I don't buy the statistical argument, statistical argument, number one. Number two, what you're saying is the state is constitutionally required to let religious groups meet unsupervised unless and until there's an incident. And I don't think the Constitution says that. First of all, Your Honor, this is a LUPA argument, not a constitutional argument with regard to that issue. Secondly, that is not our position. Our position is. Well, yes, you're saying there's never been a problem with the Muslims, so you are not allowed to supervise. And the Jehovah's Witness and all these religions are going to come and say, we want unsupervised services unless and until there's an incident. You can't require us to be supervised. Your Honor, actually, we're not saying that. What we're saying is if that claim is made, and there's no evidence that such a claim has been made or will be made. You're saying the state either has to supervise, they have to supervise all or supervise none. Well, first of all. And that they have to have the same number of services for everybody. No, Your Honor, we're clearly not saying that. We specifically pointed out in our brief that size matters, that you have to have, and I think the magic number, since I'm not going to have much time to explain this, I'll just give you the magic number, 15, according to the case law, and it's discussed in our brief. If you do not have at least 15 adherents to a particular religious group, you don't have to give them equivalent religious experiences. But here's the deal. The Christian, Jewish, Native American groups all have six hours a week. The consent decree provided that Muslims were entitled to that as well, and they had that for 35 years without a single reported incident until the TDC decided, wait a minute, if we continue to do that for Muslims, we may have to do that for the Jehovah's Witnesses as well. Not for security concerns, but relating to Muslims, but relating to these other folks. We're going to stop doing it for these other folks as well. Here's the point. You have to, in order to be required to have, and it's not unsupervised, that's clearly not the case. We say supervised, but the supervision should be indirect supervision if direct supervision is not available, and that includes the same thing they do in day rooms, the same thing they do in craft shops, the same thing they do for choir practice and for band practice, the same sort of supervision. The state makes the point that the same levels of prisoners are not in these different things, so you can't just say, well, band practice, they don't have anybody. That's the same kind of situation. It just isn't. They don't have the same classifications of prisoners in all of these groups. Three responses tonight, Judge King. First of all, the record doesn't reflect that. In point of fact, the only place that the record reflects there is separation of classification is with regard to the craft shop, but with regard to the safe prison schools, with regard to the choirs, with regard to band, with regard to dormitories. Well, I guess dormitories probably necessarily have similar classifications. With regard to all of those other things, the record does not, in fact, reflect that. Secondly, one of the chaplains that the state produced said, we can handle the different classifications by simply using, I've forgotten what the phrase is, but he uses a specific phrase that basically is excluding the folks with higher security from the religious exercises. But here's the point. That very statement proves, demonstrates relatively conclusively that there is a less restrictive means that works, that adequately satisfies security, at least for some of those Muslim inmates. What they say is, well, some Muslim inmates may have to be excluded, but not these others. Well, then what are they telling us? They're telling us that indirect supervision is, in fact, adequate for many classes of inmates. It's just that they believe that it may not be for homogenous kinds of, for homogenous groups. The director of chaplaincy testified, and this is a quote, during that 35 years of indirect supervision, the Brown government was consistent with safety and security of the unit. Now, Holt v. Hobbs tells us, Hobby Lobby tells us that in order to restrict the exercise of religious activities, the state has the burden of demonstrating that a less restrictive means will not adequately accomplish the legitimate objective. If the objective here is safety and security, and the director of chaplaincy says, we've been able to do that with indirect supervision for 35 years, quote, consistent with the safety and security of the unit. If units all over the rest of the country are using indirect supervision for Muslim services without incident, and I invite the court particularly to review the amicus brief from the former wardens. It's an excellent brief, and it's presented by the director of the California prison system. It's joined by a former head of the American Corrections Institution. I mean, these are folks who are telling us that throughout the country this is the way it's done, and in fact, so does Shabazz. Shabazz says that most, and not only Shabazz, but also the state's expert, Mr. Andrews, and our expert all testified that the indirect supervision is the way most prisons handle Muslim religious exercises. Well, if most prisons are handling it this way, then according to Holt v. Hobbs, that is persuasive evidence that there is a less restrictive means of accomplishing the legitimate security concerns of the institution, and that is to use indirect supervision where plausible rather than direct supervision for all cases, particularly where the effect of direct supervision is necessarily there's no argument. On this record, they're complaining that the district court excluded at least three broad categories of evidence. So how do we know on this record where the district court did affirmatively exclude incidents in Muslim services, how do we know it's plausible or for whom it's plausible? Don't we at least have to remand for a complete record? First of all, Your Honor, we did not object to any of that testimony, and the reason there is no testimony of exclusion in Muslim services. There is an objection to the relevance of the 2013 Ramadan service, the fisticuff that occurred, and the reason that that's not relevant is that was after the state started using direct supervision, and so that doesn't show that indirect supervision won't adequately accomplish. I disagree with you. Okay. I understand. But the other reason the court should be aware of is that there is a what happened was the state did not produce those incident reports, and they tried to produce a few, not even official incident reports, but write-ups subsequently during the middle of trial. They were objected to and officially objected to a written motion actually by the Scott interveners, and the court entered a written order now before the court is a motion to exclude the late-produced hearsay evidence, the documents, date stamps, such and such and such and such, they're excluded because they were not timely produced, and that is document number 331. So that's part of the problem. Then, finally, with regard to Mr. Potov, I'm sorry, I mispronounced that with a name like Bernberg. I get it, too, from time to time. He suggested there were two cases that indicated there was some kind of disruption. The two cases were Lemon v. TDCJ and Watson v. Wakefield. Well, in the Lemons case, the opinion, the reported opinion says no offenders were sent back to their cells, all inmates were allowed to remain and complete the service, and no disciplinary cases were given because prison authorities did not regard the incident as serious. In Watson v. Wakefield, the issue there was there had been some sort of a disruption during the service over who should be the leader, the provocateur. What was the other case you mentioned? Lemons v. TDCJ. Lemons. Watson v. Wakefield. And in Watson v. Wakefield, that was a case in which this court ruled that it was a violation of RLUIPA  because the incident was so minor it did not even justify excluding that inmate for that period of time from those services. So I have to, at this point, yield to Mr. McIvern to make the concluding remarks. But the point is we believe Hobby Lobby and Holt v. Hobbs are game changers in this case. Actually, not game changers. The law was always what the law is. And those cases, when properly applied to this case, clearly demonstrate the State has not carried its burden of demonstrating that direct supervision is sufficiently superior to indirect supervision to justify a significant curtailment of the religious exercise of Muslim inmates. Thank you, Mr. Bernberg. Mr. McIvern. Thank you, Your Honor. May it please the Court, I'm Brian McIvern here on behalf of the individual Muslim interveners in this case. And I was prepared to speak specifically towards the propriety of that intervention and the awarding of attorney's fees, but I would be remiss if I didn't agree with and reinforce the point that the record in this case is replete with examples that the prison system operates under indirect supervision as the norm. The record is replete that it does it in numerous circumstances for the majority of inmates. And there is nothing in the record to show that religious ceremonies need to be treated with a higher level of security and certainly nothing in the record that would rise to the level of showing a clear error regarding the Court's findings. Judge King, you're correct that there is a concern about different security levels within the prison system and that people who are in the band or people who are in the craft shop are in there by virtue of having a certain security level. Good records. I beg your pardon? Good records. I mean, I know that's true with respect to the band. Exactly. And I mean, the majority of people within the prison system do have minimum custody status. It's a tiny minority of folks who have a medium or heightened level of security status. Your point is that the prison could use that classification to allow most Muslims to be indirectly supervised with safety. Well, certainly. I mean, I think the issue here is that— Or you call out the really bad Muslims from religious services. Yes, Your Honor. I mean, the prison system has sought to impose policy that would apply to all Muslim inmates regardless of their security classification, even folks who are allowed to mow the lawns outside of the fence of the prison because they are such minimum security inmates, a blanket policy to all of them that would be the highest security monitoring possible. And that certainly should not apply in this case when those inmates are outside of the fence every day. Those inmates are supervised indirectly at best every day. Was this argument made—I'm doing a blank on this. Was this argument made to the district court that what the Muslims were arguing for here as an alternative, say Plan B, was to permit Muslims that have good security classifications to meet with indirect supervision? Was that actually a proposal that was made to the district court? Your Honor, I believe the argument was that the consent decree should not be terminated because the alternative that TDCJ was planning to put in place, and in fact had put in place in the interim while the consent decree was suspended, was a violation of inmates' rights and that that policy, if allowed to remain in place, TDCJ's replacement policy, the Scott plan. The burden must be on the state to come forward with that other alternative rather than the plaintiffs. Your Honor, I believe so. If the state had presented a more nuanced policy, then we might be in a different stance today. But the state has proposed to implement a policy that would be a blanket policy of heightened scrutiny to all Muslims, regardless of their security status or other circumstances. But the answer to my question is no, there wasn't a Plan B that was actually proposed by— It should have been. I'm just asking, was there? The answer was no. Your Honor, I don't have a recollection of that being proposed as a Plan B, but I do believe with Judge Dennis that that would have been the state's burden to propose as an alternative. So to answer your question, no, I don't recall that happening. We don't live in a perfect world. I agree. Did you want to say something about attorneys' fees? Yes, Your Honor. We'll give you one minute, I guess. Okay. I think it's very simple and will only require a minute. The interveners requested attorneys' fees pursuant simply to a lodestar analysis, number of hours times rate per hour. That's what they requested. That's what the court ordered, a simple award based on lodestar analysis. And a lodestar is presumptively valid. Now, the state's objection on appeal was that the order was not specific enough to allow for significant appellate review. Well, the defendants were able to provide those specific objections to the lodestar with their response to the motion, seeking to have certain items struck from the billing rate, having certain items billed at a deducted rate because they were traveled, for instance. The arguments that the defendants have set forward about greater specificity really only apply in instances in which a court provides an enhancement. Perdue v. Kennedy, for instance, which they cite to several times, involved a 75% enhancement from the lodestar award. So my brief comments on attorneys' fees were that the plaintiff simply requested a lodestar rate, the court awarded one, and the defendants were in a perfect position to raise challenges to that lodestar and how it was conducted pursuant to the arbitrary standard. They had chosen to on appeal, but instead they challenged the adequacy of the order, which I think was misplaced. Okay. Thank you, sir. Thank you. Mr. Vodafoff. Your Honor, I agree with Mr. Bermack that maybe the key question in this case is whether direct supervision is better than indirect supervision. This court has repeatedly said that it is. Also, a national commission on preventing prison rape has said that direct supervision should be used whenever possible because it's the best means of preventing sexual assault and other forms of disorder. Also, in the reply brief, we identified court decisions either approving or noting the practice in 18 different states, whereas the prison warden's brief that you were pointed to lists at most five states that have a contrary practice. So clearly the majority practice is actually to have direct supervision. But also, as this court said in Chance, nobody knows the prisons better than the prison's officials. And here we had extensive and virtually unchallenged testimony, all of which we've collected in our briefs, which suggests that volunteers are well trained. They know that whenever something is beginning to happen, they have to inform TDCJ personnel, and that unlike inmates, they're able to do so without being called a snitch, which is something that is a deadly danger for the inmate. And we also had extensive testimony from Mr. Eason, none of which the court acknowledged, about why the various alternatives that have been proposed, such as audio tapes and video surveillance, are inadequate. So in other words, the answer to whether direct supervision is better is clearly yes, both under this court's precedent and the evidence that was presented. What about the argument that most of the prison activities are in direct supervision? Sure. So first of all, contrary to what Mr. Bernberg said, we didn't just put in evidence about the craft shop at ROA 4205 and 3359. It shows that dorms also do not feature high classification inmates, food service at ROA 4206, rec time of 2620. And as for the plan B, you're right, Judge King, that was not presented to the district court. There's no findings on it. And if that had been something that was contested during the trial, we would have been able to demonstrate that that's something that would have required a lot of additional resources from TDCJ in terms of additional expenses on indirect supervision, additional facilities. And it's also something that would have potentially exposed TDCJ to statutory and constitutional claims from those, as you suggested, Your Honor, quote, bad Muslims and other individuals that were left out of religious services. So there are many reasons why we have not pursued that alternative. I also would like to quickly address the notion that the slippery slope argument, that we would have to then exempt all other faiths as well from direct supervision, is something that was precluded by Holt v. Hobbs. It was not. In Holt, it was a bare assertion, whereas here we're relying on an actual holding from a district court in this circuit that all but proclaims that once we exempt any faiths from direct supervision, we have to exempt all faiths from direct supervision. And Mr. Berman does not contest, and indeed they concede in their briefs, that the services of other faiths are in fact dangerous. So clearly TDCJ, under our LUPA or the Constitution, should not be forced to allow all faiths to proceed without direct supervision, which is the kind of risk that we're being exposed to if the appellees prevail. I would also like to quickly address the question of Jewish and Native American prisoners that are put into designated facilities. As Mr. Bernberg correctly acknowledged, both of those groups are smaller than Muslims, and therefore it is easier to put them into designated facilities. And that's something, again, that we have expert testimony on, that the court did not acknowledge, let alone respond to the district court. And also— How many religious groups have more than 15 members? More than 15 members? I'm not certain, but they're arranged into 10 large groupings, and I suspect all of them are greater than 15 members, 10 or 11 large groupings. So the other point about putting Muslim inmates into a designated facility is that it creates concerns about religious and racial segregation. There was actually, in the consent decree, a provision about religious segregation of Muslims, and it could not be done without an affirmative request from the Muslim prisoner. So that both makes it more administratively difficult to put them in a designated unit, and also understandably causes TDCJ to be concerned about doing so, because it's the very sort of thing that caused complaints in the past. And there have also been complaints in the past about racial segregation of African American inmates, and the majority of Muslims are African American in TDCJ. So we had, again, expert testimony that was not acknowledged by the court that that is another source of concern for TDCJ. I would also like to quickly address the Watson and Lemons opinions, both of which I would submit strongly reinforce our concerns about unsupervised Muslim services. So in Watson, for instance, the court actually said that there's a compelling government interest in security that was undermined by the disruption. And the chaplain testifying in that case noted that there was a particular danger of Muslim services precisely because they were not directly supervised, which caused the chaplain to frequently have to take more aggressive measures than with other services, such as excluding prisoners from religious services for extended periods of time. And with respect to the Lemons case, that was a situation in which two groups of inmates had squared off and were yelling at each other, and the situation was so intense that a riot team had to be called in order to pacify them. And we would say this court as well has noted the danger of unsupervised Muslim services. In DeMoss v. Crane, it noted an instance where a tape was played at an unmonitored Muslim service, which had anti-government messages on it, anti-government rhetoric, and disparaged other faiths. So, again, there was a lot of evidence supporting TDCJ's position in this case. Much of it was incorrectly excluded by the district court. What's your best case on who's got the burden of proof under the Act when the state is seeking to modify a consent decree? So, Your Honor, under the PLRA, that would be Guajardo v. TDCJ. And there this court said that the PLRA strongly disfavors prospective relief of the precise sort that is involved in this case. So I would point you to that opinion. If there are no further questions, thank you.